IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00904-MEH

RUSSELL LARSON,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Russell Larson appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **AFFIRMS IN PART AND REVERSES IN PART** the ALJ's decision, **AND REMANDS** the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying his application for

SSI benefits filed on November 18, 2011.  [AR 205-210]  After the application was initially denied

on February 9, 2012 [AR 109-111], an Administrative Law Judge ("ALJ") scheduled a hearing upon

the Plaintiff's request for June 21, 2012 [AR 133-137].  Plaintiff was unable to appear for the

hearing; accordingly, the medical expert testified and the ALJ continued the hearing to August 22,

2012. [AR 67-92] Plaintiff and a vocational expert testified at the August hearing. [AR 30-66]  The

ALJ issued a written ruling on August 31, 2012 finding Plaintiff was not disabled since November

18, 2011, because considering Plaintiff's age, education, work experience and residual functional

capacity, there were jobs existing in significant numbers in the national economy that Plaintiff could

perform.  [AR 14-25]  The SSA Appeals Council subsequently denied Plaintiff's administrative

request for review of the ALJ's determination, making the SSA Commissioner's denial final for the

purpose of judicial review [AR 1-4].  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed his complaint

with this Court seeking review of the Commissioner's final decision.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on August 6, 1962; he was 49 years old when he filed his application for

supplemental security income benefits on November 18, 2011.  [AR 205-210]  Plaintiff claims he

became disabled on June 1, 1993 [AR 244] and reported that he was limited in his ability to work

by "hearing [loss], mild mental retardation, and migraines."  [AR 248]

### A.    Physical Conditions

Plaintiff completed a "Headache Questionnaire" in tandem with his application, in which he

described having been diagnosed with "severe migrain[e] headaches" that lasted a "½ hour to 45

minutes" and for which he took 800 mg of Ibuprofin "2 to 3 times a day" that "kill[ed] [the] pain and

joint stiffness" within "20 to 30 minutes" of taking the medication. [AR 266-267] Although Plaintiff did not denote the frequency of his headaches, he placed a mark in the box for "per week" and noted that his last headache had occurred approximately two weeks previously on November 24, 2011. [*Id.*]

The medical records reflect that Plaintiff had been prescribed Ibuprofin (600mg twice a day) for his headaches during his incarceration from approximately February 9, 2011 to his discharge on approximately November 9, 2011.  [AR 329, 353]  However, on November 14, 2011, Plaintiff visited the clinic at "SSC Medical" and complained of low back pain, but denied having headaches; the physician ordered Ibuprofin (800mg twice a day) for his back pain. [AR 368-369] Then, on December 30, 2011, Plaintiff complained of neck and shoulder pain, and was prescribed Neurontin (300mg three times a day) in addition to the Ibuprofin. [AR 409-411] On February 23, 2012, a physician changed the Ibuprofin to Acetaminophen (325mg every 8 hours as needed) during a visit when Plaintiff complained of upper respiratory symptoms. [AR 419-421] In a May 12, 2012 record, Plaintiff presented complaining of a headache and shortness of breath; Plaintiff reported that he had a "lifelong" history of headaches that came and went "3-4 times per day," and that he had been prescribed Neurontin for the headaches. [AR 433] The physician's assistant reminded Plaintiff to take the Neurontin three times per day (not twice) and diagnosed him with acute sinusitis. [AR 434-436] Finally, a record titled, "Patient Plan" from June 11, 2012 reflects that the Neurontin (also known as Gabapentin) was increased to 600mg three times a day; a handwritten note next to the medication list reflects "headaches." [AR 441]

As for Plaintiff's hearing loss, a medical record from January 8, 2010 notes "hearing loss –

bilateral aids worn" [AR 355] and a physical assessment form from the Department of Corrections, dated October 24, 2011, notes the Plaintiff is "hard of hearing [in] both ears with accommodations while in DOC" and is "probably most limited by his hearing disability." [AR 331-332] On December 3, 2011, a physician, K. James Schlegel, D.O., diagnosed Plaintiff with hearing loss and provided him batteries for his hearing aids. [AR 379]

B.    Mental Conditions

In October 2009, Plaintiff was diagnosed with depressive disorder (not specified) and his medication was changed from Zoloft to Prozac. [AR 325-327] In the months following, Plaintiff's medications were changed at his request until March 18, 2010, when he reported he was "stable" and stated "he does not need nor does he want to take psychiatric medications any longer." [AR 313] In fact, on November 17, 2010, Plaintiff's treating psychologist, Peggy Steele, Psy.D., notes Plaintiff "is not currently on psychiatric medications. He says he is doing really well and describes being a little bored waiting to get out." [AR 305] A health record dated February 9, 2011 reflecting a "complete physical" of the Plaintiff reflects no medications taken for mental health issues. [AR 353] There are no records reflecting that Plaintiff met with Dr. Steele again after December 2010; however, Dr. Steele completed a health record on October 14, 2011 noting that Plaintiff "struggles with problem solving, impulsivity and other cognitive abilities," and "has previously received social security benefits qualifying with a diagnosis of mental retardation." [AR 300]

Just before his release from incarceration, Plaintiff was assessed by Stuart Silberman, Psy.D., for a "disability determination" of his mental health. [AR 298-299] Dr. Silberman found Plaintiff was "victim prone, [had] difficulty resolving problems in socially acceptable manners, stable." The

doctor assessed Plaintiff with depressive disorder, amphetamine dependence, mild retardation, and

a GAF score of 45.[1] [*Id.*]

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely

During his first physical examination after incarceration at the Stout Street Clinic, Plaintiff reported he was "on mental health meds in prison but then ran out and never could get in to see psych. ... Has MR, hallucinates fells [sic] like people talking about him. Can't be around large groups of people. Hears noises, not words." [AR 368] The following month, December 3, 2011, Dr. Schlegel completed a "Med-9" form for state disability benefits in which he diagnosed Plaintiff with a mood disorder, developmental delay, and learning disability, and determined Plaintiff would be disabled for 12 months or longer because he had "no current access to mental health." [AR 383, 393]

Plaintiff presented to Stuart Kutz, Ph.D. for a consultative mental health examination on January 24, 2012. [AR 384-391] He reported to Dr. Kutz that he last took psychoactive medication in 2003 or 2004 for anxiety, depression and mood swings, but stopped taking the medication because he did not like the "groggy" feeling. [AR 385] Plaintiff stated that his mental health symptoms were "starting to get worse, [his] attitude, mood swings." Dr. Kutz reviewed Plaintiff's medical records, performed a "detailed mental status examination" and the Wechsler Adult Intelligence Scale test, and concluded mild mental retardation was not indicated, but Plaintiff had both borderline intellectual functioning and a learning disorder, as well as a mood disorder, probable post-traumatic stress disorder, and a GAF score of 58. [AR 390]

Two days later, Plaintiff had an initial psychiatric evaluation at the Stout Street Clinic at which Plaintiff reported anxiety, anger, and both audio and visual hallucinations. [AR 415-417]

---

incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

Marilyn Smith, M.D. assessed Plaintiff with post-traumatic stress disorder, an unspecified mood disorder and a GAF score of 38. [*Id.*] Plaintiff saw Dr. Smith again on March 8, 2012 complaining of anger, mood swings and visual hallucinations. [AR 426-428] The doctor assessed Plaintiff with "unspecified psychosis" in addition to her other diagnoses, prescribed medication for such psychosis, and assessed Plaintiff with a GAF score of 36.

## III.    Hearing Testimony

On June 21, 2012, the Plaintiff did not appear in time to testify, but his counsel, Sarah Wilkinson, timely appeared and a medical expert, psychologist Mary Buban, Ph.D., testified. [AR 69-92] After verbally reviewing the medical records, Dr. Buban noted inconsistencies between the recent records and those from Plaintiff's incarceration, asserting that Plaintiff's recent mental health physicians conceded they did not have access to Plaintiff's historical records; accordingly, the GAF score of 38 was based solely on Plaintiff's reports.  She also noted that many of the opinions rendered were based on a mistaken assumption that Plaintiff had mild mental retardation.  Dr. Buban determined that the diagnoses most consistent in the record were the depressive disorder and personality disorder.  She conceded that Plaintiff had anger issues, as demonstrated by an altercation Plaintiff had with a prison guard, but noted other places in the record where Plaintiff reported "backing off" during angry episodes or potential altercations.  Dr. Buban concluded that Plaintiff would have no limitations in understanding and remembering simple instructions, carrying out simple instructions, and the ability to make work-related judgments for simple decisions; mild limitations in activities of daily living, and in interacting with supervisors and co-workers; and moderate limitations in social functioning, concentration, persistence and pace, understanding,

7

remembering and carrying out complex tasks, making judgments for complex decisions, and responding appropriately to changes in a routine work setting. [*Id.*]

At the continued hearing on August 22, 2012, the Plaintiff, his counsel, and vocational expert Cynthia Bartman appeared.  [AR 32-65]  Plaintiff's counsel opened by amending Plaintiff's disability onset date to November 4, 2011.  The Plaintiff then testified that the biggest problem he needed to overcome to be able to work was the difficulty of "be[ing] around a group of people" and "not being able to fully comprehend what [he's] supposed to do without going back at least half a dozen times, maybe more, to ask."  He stated that he typically walked a lot to help with stiffness and headaches, which he had "on and off" since he was 18, and stopped using drugs and alcohol in 1985. Plaintiff also attested that he was partially deaf in his left ear and "fully deaf" in his right ear.  He claimed to have "bad temper" days 4-5 times per week during which he would have more than one angry outburst per day, to have difficulty remembering and carrying out simple instructions, to forget where he put things, to see shadows or something moving that is not there, to have outbursts of crying 7 or more times per month, to have daily 1-2 hour migraines triggered by noise, and he has increased bursts of energy that last 25-30 minutes each. [AR 36-60]

Ms. Bartman testified that an individual with Plaintiff's age, experience and education – who is partially deaf; should not be exposed to noise levels beyond moderate; can understand, remember and carry out work, instructions and procedures that can be learned by demonstration within a period of 30 days; has no work interaction with the public and only occasional interaction with a supervisor and co-workers; whose work duties should be routine, repetitive and in an essentially unchanging work environment; and whose reasoning, language and math skills would be limited to "one" as

defined in the General Education Development section – could perform the jobs of night cleaner, garment sorter, and a tree/agricultural laborer. With the added restrictions of no driving, no dangerous moving machinery and no concentrated exposure to pulmonary irritants, only the agriculture laborer position would be eliminated. Finally, she testified that an individual who would be off task more than 20% of the workweek and/or absent more than one day per month would be unable to participate in competitive employment. [AR 61-64]

The ALJ issued an unfavorable decision on August 31, 2012. [AR 11-25]

## LEGAL STANDARDS

### I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work

activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c).   Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   If the impairment is not listed, she is not presumed to be conclusively disabled.   Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.   If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).   Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.   Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).   Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).   "Substantial evidence is more than a scintilla, but less than a

preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

### ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the amended onset date of his disability, November 4, 2011 (Step One). [AR 16] Further, the ALJ determined that Plaintiff had the following severe impairments: borderline intellectual functioning, personality disorder, affective disorder, hearing loss and migraines (Step Two). [*Id.*] Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 16-17]

The ALJ then determined that Plaintiff had the RFC to perform "a full range of work at all exertional levels, but with the following non-exertional limitations: As the claimant is deaf in one ear and can hear only loud voices with the other, he cannot perform work that requires acute bilateral hearing or jobs where a hearing loss would cause danger to the claimant or others, and cannot be exposed to noise levels beyond moderate or level 3 (office level). Mentally, the claimant can understand, remember and carry out basic tasks learned by demonstration in 30 days with level 1 for

11

reasoning, math and language requirements (as used in the General Education Development provision of the Selected Characteristics of Occupations), and that is routine, repetitive work occurring in a relatively unchanging work environment. He can have occasional work interaction with co-workers and supervisors, but no work interaction with the public.  The claimant cannot drive as a requirement of the job, cannot work with/near dangerous machinery, and must avoid concentrated exposure to fumes, odors, and dust/airborne particulate matter that would be pulmonary irritants." [AR 19]  The ALJ determined that the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above functional capacity assessment." [AR 18]

The ALJ went on to determine that Plaintiff had no past relevant work (Step Four), and that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform the jobs existing in significant numbers in the national economy.  [AR 24]  As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 24-25]

Plaintiff sought review of the ALJ's decision by the Appeals Council on November 15, 2012. [AR 9]  On January 24, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1-3]  Plaintiff timely filed his Complaint in this matter on March 28, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ erred by failing to consider and make adequate findings of fact regarding whether Plaintiff's mental impairment meets or equals the severity of Listing 12.05; (2) the ALJ erred by failing to apply the "treating physician rule" in evaluating the medical opinion evidence; (3) the ALJ failed to adequately develop the record regarding Plaintiff's physical functional impairments; and (4) the ALJ's finding that the jobs of night cleaner and garment sorter are within Plaintiff's RFC restrictions is not supported by substantial evidence.

## ANALYSIS

The Court will address each of Plaintiff's issues in turn.

## I.     Whether the ALJ Erred by Failing to Consider Evidence regarding Listing 12.05

The ALJ in this case found the Plaintiff's borderline intellectual functioning is a severe impairment that more than minimally impaired his ability to perform work-related duties.  The ALJ further found that Plaintiff had the severe impairments of an affective disorder (Listing 12.04) and a personality disorder (Listing 12.08).  The ALJ relied primarily on the testimony of Dr. Buban saying,

> Dr. Buban testified that the record does not support MMR [mild mental retardation] and only marginally supports BIF [borderline intellectual functioning]. The doctor noted that the MMR was incorrectly diagnosed by Dr. Silberman, who assessed this diagnosis apparently based on a 1997 IQ score of 83, which Dr. Buban testified indicates low average intellectual capacity. Dr. Buban opined that the claimant has no difficulties in understanding, remembering and carrying out simple instructions and making simple work-related judgments as evidenced by his ability to perform simple jobs in prison at Ex. IF.  Dr. Buban felt that the claimant had moderate difficulties in understanding, remembering and carrying out complex task[s] and

making complex work related decisions, based on his BIF.  The doctor opined to moderate limitations in the claimant's abilities to interact with public, mild limitations in interacting with supervisors and coworkers, and moderate limitations in responding to changes in a work setting.  Dr. Buban's assessment i[s] fully credible and persuasive as she was able to review the claimant's entire file, listened to the hearing testimony, could ask questions at the hearing and could consider the matter as a whole.   Dr. Buban's opinions are not inconsistent with any of the medical records including the State Agency examiners, the consultative examiners and the claimant's treating physicians. There are no medical source opinions that find the claimant disabled. The residual functional capacity adopted herein gives the claimant every benefit of the doubt, as it is the most restrictive of the recommendations.

[AR 23-24]

Plaintiff argues that his score of 68 for the Verbal Comprehension Index of the Wechsler Adult Intelligence Scale test suffices to meet paragraph C of Listing 12.05 and this, combined with the ALJ's determination that Plaintiff's ability to work was also impaired by personality and affective disorders, hearing loss and migraine headaches, means that Plaintiff met or exceeded the requirements of Listing 12.05 and benefits must be awarded.  Alternatively, Plaintiff contends that the ALJ should have, at least, explained his decision and made findings of fact concerning this listing.  Defendant counters that Plaintiff fails to identify and meet all of the mandatory criteria under Listing 12.05, and that the ALJ adequately explained why the evidence did not support finding that Plaintiff's condition satisfied any of the Listings.

The Social Security Administration's Listing of Impairments includes Section 12.00 titled, "Mental Disorders."  In this case, Plaintiff challenges the ALJ's finding that she did not meet the requirements of Section 12.05 for intellectual disability.  Section 12.05 provides:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested

14

during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, subpt. P, app. 1.  A claimant must meet the "preamble" or "capsule" definition in addition to meeting one of the four severity prongs listed in subsections A-D.  *See Montano v. Astrue*, No. 11-cv-02303-WJM, 2012 WL 6701804, at *2 (D. Colo. Dec. 26, 2012); *see also King v. Astrue*, No. 10-cv-01530-LTB, 2011 WL 3471015, at *4 (D. Colo. Aug. 8, 2011) (to meet listing

12.05, the plaintiff "had to show that his impairment met or equaled the capsule definition of mental retardation; that he had a valid IQ score of 70 or below; and that he had another severe impairment.").

First, the Plaintiff contends that he meets the capsule definition of 12.05 because the evidence reflects that Plaintiff "was enrolled in special education during his school years." Notably, Plaintiff's testimony and reports to medical sources are the only evidence in the record of this fact. "[A]bsent documentary evidence of a deficit prior to the age of twenty-two, the ALJ may find plaintiff's testimony of participation in special education insufficient to support a finding of meeting listing 12.05." *May v. Colvin*, No. 2:12-cv-00700-EJF, 2013 WL 6732116, at *5 (D. Utah Dec. 19, 2013) (citing *Gist v. Barnhart*, 67 F. App'x 78, 82 (3d Cir. 2003)). Moreover, the Court agrees that the lack of medical findings showing Plaintiff has mild mental retardation, in addition to Plaintiff's ability to earn a GED, belie the notion that Plaintiff suffers from an intellectual disability as defined in the preamble to Listing 12.05.

Second, the Court agrees with Defendant that Plaintiff's score of 68 in the Wechsler test is insufficient to meet the requirements of 12.05C. That section requires a "valid" verbal score of 60-70. Dr. Kutz, who performed the Wechsler test with Plaintiff, concluded that "[f]ormal examination of intellectual functions with the Wechsler [test] yields scores that are considered to be slight underestimates of his 'true' level of functioning and <u>NOT</u> fully valid." [AR 388 (emphasis in original)] Dr. Kutz explained that during the verbal test, Plaintiff "seemed somewhat sleepy" and he questioned Plaintiff's "effort and attention." [AR 389] The doctor also concluded that Plaintiff's scores "suggest[ed] an underlying Learning Disability as well," and found "Mental Retardation is

not indicated." [*Id.*]

Accordingly, the Court finds the ALJ did not err in failing to consider or make findings of fact as to Listing 12.05 in this case.

## II.   Whether the ALJ Erred in Failing to Apply the "Treating Physician Rule"

Plaintiff argues that the ALJ "dismissed the opinions of Mr. Larson's treating sources regarding his mental retardation, and instead relied heavily on the opinion of Dr. Buban, a medical expert who testified at the first hearing before the ALJ."  Plaintiff proceeded to argue why Dr. Buban's opinion was not entitled to substantial weight, but did not identify any treating source's opinion concerning Plaintiff's "mental retardation."  *See* Opening Brief, docket #13 at 25-26.

According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources."  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 416.927(c)(1).  In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it."  *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995).  A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive – that is,

whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); *accord Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014); *see also* 20 C.F.R. § 416.927(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step, because "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d at 1300; *see also Mays*, 739 F.3d at 574.  At the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.  If this is not done, remand is mandatory. *Id.*  As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and

> 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4).   Hence, the absence of a condition for controlling weight raises, but does not resolve the second, distinct question of how much weight to give the opinion.   *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331.   In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Without these findings, remand is required. *Watkins*, 350 F.3d at 1300-01; *accord Krauser*, 638 F.3d at 1330.   Finally, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so.   *Watkins*, 350 F.3d at 1301.

A fundamental flaw in Plaintiff's argument is that he fails to identify a treating source's opinion that he suffers mental retardation, which would deserve controlling or substantial weight

over Dr. Buban's opinion that Plaintiff suffers borderline intellectual functioning.  Plaintiff's only reference to a "treating source" is when he argues "Dr. Buban insisted throughout her testimony that the opinions of Mr. Larson's mental health providers at the DOC and the Stout Street Clinic were wrong."  Opening Brief, docket #13 at 25.  The only mental health provider that actually diagnosed Plaintiff with mild mental retardation was Stuart Silberman, Psy.D. who noted such diagnosis in a two-page standardized CDOC Disability Determination Worksheet in which his only narrative included: "victim prone, difficulty resolving problems in socially acceptable manner, stable." [AR 298-99]  There is no evidence that Dr. Silberman treated Plaintiff or even saw him on more than one occasion, the exam at which he completed the form.  Further, the Plaintiff's actual treating psychologist at the CDOC, Peggy Steele, never diagnosed him with mental retardation, but simply noted in a health record, "Mr. Larson has previously received social security benefits qualifying with a diagnosis of mild mental retardation." [AR 300]

Following his release, Plaintiff's treating physician at the Stout Street Clinic, Karl Schlegel D.O., diagnosed Plaintiff with "developmental dyslexia" and "benign essential hypertension" on December 3, 2011.  [AR 378] That same day, apparently based on his diagnosis, Dr. Schlegel completed a Med-9 form in which he noted as a diagnosis, "developmental delay/learning disabled." [AR 393] *See, e.g., Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012) ("The ALJ properly gave no weight to this conclusory [Med-9] form, which lacked any functional findings.").  Then, in March 2012, Dr. Schlegel diagnosed Plaintiff with post-traumatic stress disorder and an unspecified episodic mood disorder.  [AR 425]  Three days later, Marilyn Smith, M.D. at the same clinic, diagnosed Plaintiff with the same disorders and added an "unspecified psychosis" for which she

prescribed Risperdal; however, there is nothing in her assessment concerning Plaintiff's intellectual function.  [AR 426-428]

Accordingly, because the Plaintiff failed to identify a treating source to which the ALJ failed to apply the treating source rule, and the Court finds no treating source having opined that Plaintiff suffers mild mental retardation, Plaintiff's argument is unavailing.

**III.    Whether the ALJ Failed to Adequately Develop the Record regarding Plaintiff's Physical Functional Impairments**

Plaintiff argues that the ALJ failed to assign restrictions in Plaintiff's RFC related to his migraine headaches.  In the alternative, citing 20 C.F.R. § 416.1519a(b), Plaintiff contends that the ALJ should have obtained additional evidence from Plaintiff regarding his physical impairments and/or ordered a consultative examination regarding the functional effects of Plaintiff's migraines and hearing loss.

First, the Court finds that the Plaintiff misstates the record in arguing that "the ALJ failed to inquire at the hearing about the functional limitations Mr. Larson suffered because of" his physical impairments.  Opening Brief, docket #13 at 27.  At the hearing, the ALJ asked whether the Plaintiff could hear him well enough, and the Plaintiff explained that he is "partially deaf in [his] left ear and fully deaf in [his] right" and may need to cup his hand around his ear if he cannot hear. [AR 44] Moreover, the ALJ heard Plaintiff's testimony about what triggers Plaintiff's migraines (noise) and how they affect him physically. [AR 51]

Importantly, the regulation Plaintiff cites is instructive.  According to Plaintiff, the ALJ was required to order a consultative examination pursuant to § 416.1519a(b)(1) which provides

21

essentially that a consultative examination may be required when "the additional evidence needed is not contained in the records of [the claimant's] medical sources." Plaintiff contends that the record here "clearly establishes" the need for a consultative examination; however, Plaintiff fails to articulate such need. To the extent that the Plaintiff contends additional evidence was necessary because the ALJ failed to include any restrictions in the RFC related to Plaintiff's migraines, the record reflects the opposite. As set forth above, Plaintiff testified that his migraines are triggered by loud noises, such as train whistles, car horns and fire trucks [AR 51]; accordingly, the RFC provides that Plaintiff "cannot be exposed to noise levels beyond moderate or level 3 (office level)." [AR 18]

The Court concludes that the ALJ adequately developed the record and substantial evidence supports the RFC related to Plaintiff's physical impairments.

**IV.     Whether the ALJ Properly Determined the Plaintiff Could Perform the Jobs of Night Cleaner and Garment Sorter**

Plaintiff argues that the ALJ improperly relied on the vocational expert's testimony that an individual having the same age, background, experience and RFC as the Plaintiff could perform the jobs of garment sorter and night cleaner. Specifically, Plaintiff contends that the garment sorter position requires a higher level of functioning in math and reasoning than that set forth in the RFC. Further, Plaintiff asserts that the night cleaner position requires driving and exposure to pulmonary irritants, which are prohibited in the RFC. Defendant counters conceding that the ALJ erred in relying on the expert's testimony concerning the garment sorter position; however, Defendant claims that the night cleaner position is still appropriate for someone with Plaintiff's restrictions, since it

*requires* neither driving nor exposure to pulmonary irritants, but simply *may* include these duties.

At step 5 of the sequential process, an ALJ bears the burden "to show that there are jobs in the regional or national economies that the claimant can perform with the limitations the ALJ has found [the claimant] to have." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Specifically,

> the ALJ must find that the claimant retains particular exertional [and non-exertional] capacit[ies], decide whether the claimant has acquired transferable skills, identify specific jobs that the claimant can perform with the restrictions the ALJ has found the claimant to have, and verify that the jobs the claimant can do exist in significant numbers in the regional or national economies. All of these findings must be supported by substantial evidence.

*Id.* at 1088-89; *see also Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005). "Determining 'the functional demands and job duties' of specific jobs and matching those requirements to a claimant's limitations is the very task the ALJ must undertake at step five." *Haddock*, 196 F.3d at 1090. Accordingly, an ALJ may rely on the testimony of vocational experts (VEs) and/or reliable publications, such as the Dictionary of Occupational Titles (DOT). *Id.* "Questioning a vocational expert about the source of his opinion and any deviations from a publication recognized as authoritative by the agency's own regulations falls within the ALJ's duty to develop the record." *Id.* at 1091. Thus, "[a]n ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." *Id.*; *see also Krueger v. Astrue*, 337 F. App'x 758, 761-62 (10th Cir. 2009) (the ALJ committed reversible error by failing to ask the VE to reconcile a conflict between the expert's testimony and the definitions of certain jobs in the

DOT).

In this case, the Defendant concedes the ALJ's failure in seeking clarification from the VE of the conflict regarding the Level 1 restriction on math and reasoning functions in the hypothetical and the Level 2 function required for a garment sorter as defined in the DOT. However, the Defendant contends there was no conflict that needed clarification for the night cleaner position, since the position, as defined in the DOT, does not require driving and/or exposure to pulmonary irritants. Plaintiff cites the job of Cleaner, Commercial or Institutional, DOT #381.687-014, which is defined as:

> Housekeeper; janitor; laborer, building maintenance; mopper; porter; scrubber; sweeper
> Keeps premises of office building, apartment house, or other commercial or institutional building in clean and orderly condition: Cleans and polishes lighting fixtures, marble surfaces, and trim, and performs duties described in CLEANER (any industry) I Master Title. May cut and trim grass, and shovel snow, using power equipment or handtools. May deliver messages. May transport small equipment or tools between departments. May setup tables and chairs in auditorium or hall. May be designated according to duties performed as Hall Cleaner (hotel & rest.); Light-Fixture Cleaner (any industry); Marble Cleaner (any industry); Metal Polisher (any industry); Paint Cleaner (any industry); or according to equipment used as Scrubbing-Machine Operator (any industry).

Opening Brief, docket #13 at 30. Plaintiff argues that "[c]leaning and polishing floors and other areas involves the use of cleaning compounds that would expose Mr. Larson to fumes and odors, while cutting and trimming grass requires the use of machinery in a manner akin to driving, and also exposes and individual to gasoline fumes, dust, grass particles, and other airborne irritants, yet the ALJ made no findings regarding these issues." *Id.*

Even taking as true the Defendant's arguments that the night cleaner position does not

necessarily require driving and that Plaintiff improperly relies on the job description's "may items,"[2]

the Court agrees with the Plaintiff that the job's *requirement* that a cleaner "cleans and polishes

lighting fixtures, marble surfaces and trim" would more than likely involve the use of cleaning

compounds that may emit odors, fumes and/or other potential pulmonary irritants.   In fact, the

description also requires that the worker "perform duties described in CLEANER (any industry) I

Master Title."   According to the DOT, a CLEANER I (any industry) is described as:

> Maintains premises of commercial, institutional, or industrial establishments, office
> buildings, hotels and motels, apartment houses, retirement homes, nursing homes,
> hospitals, schools, or similar establishments in clean and orderly condition,
> performing the following duties: Cleans rooms, hallways, lobbies, lounges, rest
> rooms, corridors, elevators, stairways, and locker rooms and other work areas.
> Sweeps, scrubs, waxes, and polishes floors, using brooms and mops and powered
> scrubbing and waxing machines. Cleans rugs, carpets, upholstered furniture, and
> draperies, using vacuum cleaner. Dusts furniture and equipment. Polishes metalwork,
> such as fixtures and fittings. Washes walls, ceiling, and woodwork. Washes
> windows, door panels, and sills. Empties wastebaskets, and empties and cleans
> ashtrays. Transports trash and waste to disposal area. Replenishes bathroom supplies.
> Replaces light bulbs.

*See* Dictionary of Occupational Titles, Master Titles and Definitions for Cleaner I (any industry),

http://www.occupationalinfo.org/masters_1.html. Certainly, such duties would require the use of

---

[2]Defendant describes a "may item" as follows:

The body of each of the job definitions in the DOT generally "consists of two or
three main parts: a lead statement, a number of task element statements, and a
third part known as a 'may' item." DOT, Parts of the Occupational Definition,
1991 WL 645965. "May" items "describe duties required of workers in this
occupation in some establishments but not in others. The word 'May' **does not
indicate that a worker will sometimes perform this task but rather that some
workers in different establishments generally perform one of the varied tasks
listed**." *Id.* (emphasis added).

Response Brief, docket #16 at 23.

chemical compounds that may emit odors and fumes, as well as possible "dangerous machinery" (i.e., powered scrubbing and waxing machines).  The ALJ in this case did not ask the VE to clarify his finding that the hypothetical individual (using the RFC crafted by the ALJ) could perform these duties, considering the conflict between the ALJ's restrictions concerning pulmonary irritants and use of dangerous machinery and the duties required by the night cleaner position.  Accordingly, since both the night cleaner position and the garment sorter position, as defined by the DOT and on which the ALJ relied to determine at step 5 that the Plaintiff is not disabled, conflict with the RFC, and the ALJ failed to develop the record by clarifying or resolving these conflicts, the case must be remanded for further consideration.

## CONCLUSION

In sum, the Court concludes that the ALJ properly determined the Plaintiff did not have a severe mental impairment that met Listing 12.05, omitted application of the "treating physician rule," and developed the record regarding Plaintiff's physical impairments.  However, the ALJ failed to develop the record in clarifying the conflicts between the night cleaner and garment sorter positions (as defined by the DOT) and the RFC.  This failure requires remand "to allow the ALJ to address the apparent conflict."  *Hackett*, 395 F.3d at 1176.  Upon remand, the Court directs the Commissioner to reconsider the decision in light of the ALJ's deficiencies.

Therefore, the decision of the ALJ that Plaintiff Russell Larson was not disabled is **AFFIRMED IN PART AND REVERSED IN PART, AND REMANDED** to the Commissioner for further consideration and/or clarification in accordance with this order.

Dated at Denver, Colorado this 15th day of May, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge